**STATE of Missouri, Respondent,**

v.

**Justin SHELTON, Appellant.**

### No. ED 104424

Missouri Court of Appeals, Eastern District, DIVISION FOUR.

Filed June 27, 2017

Application for Transfer to Supreme Court Denied July 27, 2017

Application for Transfer to Supreme Court Denied October 31, 2017

856

Michael Gross, 231 S. Bemiston, Suite 250, St. Louis, MO 63105, for appellant.

Joshua D. Hawley, Nathan J. Aquino, P.O. Box 899, Jefferson City, MO 65102, for respondent.

KURT S. ODENWALD, Judge

## Introduction

Justin Shelton ("Shelton") appeals from the judgment of the trial court following his conviction by a jury on one count of second-degree drug trafficking. Shelton raises three points on appeal. First, Shelton claims that the trial court erred by refusing to declare a mistrial after a veniremember purportedly opined on the credibility of the State's witnesses. Point Two charges the trial court with plain error for allowing the State to mischaracterize the testimony of a defense witness during closing argument. In Point Three, Shelton avers that he is entitled to a new trial based on newly discovered evidence.

Because the veniremember's comment was not so prejudicial and inflammatory as to taint the entire panel, the trial court's refusal to declare a mistrial was not erroneous. Nor did the trial court plainly err in not limiting the State's closing argument as the evidence supported the State's characterization of the defense witness's testimony. Finally, Shelton was not entitled to a new trial because he did not establish that the newly discovered evidence was credible or that he used due diligence in obtaining such evidence. Accordingly, we affirm the judgment of the trial court.

## Factual and Procedural History

The State charged Shelton with one count of the Class A felony of second-degree drug trafficking in violation of Section 195.223.[1] The State alleged that Shelton, a persistent offender and a persistent

---

1. All statutory references are to RSMo (Cum. Supp. 2013).

drug offender, knowingly possessed more than ninety grams of a substance containing heroin. The case proceeded to a jury trial.

## I. Voir Dire

After a few introductory remarks during voir dire, the prosecuting attorney asked the venire if any of its members recognized her. Veniremember Prost ("Prost") answered that, because he was a lieutenant with the city's police department, he recognized the prosecuting attorney. Prost said that his employment with the police department would not affect his ability to remain impartial.

Shortly thereafter, the prosecuting attorney advised the venire that she would recite the names of potential witnesses for the State and then ask if any of the veniremembers were acquainted with the recited witnesses. The prosecuting attorney then expressly identified Prost, stating "Mr. Prost, I understand you probably know a lot of them, and I'll ask you a question after we get done." The witnesses were listed, and subsequently the prosecuting attorney addressed Prost:

Q: [I] knew I would get back with you, Mr. Prost. All of the people that I listed, like I said, I'm sure you know a handful of them.

A: Yes.

Q: Any one of the people that I listed do you have a personal relationship with where it would be hard for you to listen to the evidence that they present given your—

A: Three of the names—three of the names you put out there, Detective [Thomas] Mayer, Detective Lila Payne, Detective Joe Shipp, have all worked for me in the past in some sort of fashion.

Q: They've worked for you?

A: I was their supervisor.

Q: Right. Okay. And do you feel because you were their supervisor at some point you wouldn't be able to listen to them as a witness on the stand and take their testimony as they give it in this case, evaluate their testimony based on that and not your personal relationship with them?

A: Taking the personal relationship out of it and make it strictly professional, all three of those detectives having worked for me, I trust their—

Defense counsel interrupted Prost's answer and requested to approach the bench. Before defense counsel specified the nature of his objection, the trial court sustained the objection. The trial court directed the prosecuting attorney to move on from questioning Prost. The parties then approached the bench, and the trial court further admonished the prosecuting attorney that "[y]ou have to be extremely careful in asking any policeman about how he—you know, how he feels about other people. He just started to comment on the testimony, and that's why we can't go there."

Defense counsel moved for a mistrial, which the trial court denied. The trial court informed defense counsel that the situation may warrant a curative instruction. Defense counsel never requested a curative instruction. The trial court struck Prost for cause, but permitted Prost to remain seated with the venire during the rest of voir dire. In voir dire, the other veniremembers were extensively questioned regarding any potential bias pertaining to the testimony of police officers. The parties selected a jury from the venire.

## II. The State's Evidence

Detective Joe Shipp ("Del. Shipp") testified that, on September 5, 2013, he was driving westbound on Interstate 70 in downtown St. Louis.[2] Shortly before 1:00 p.m., Det. Shipp observed a white GMC Yukon Denali ("the SUV") with tinted windows on the interstate. Det. Shipp believed that the tinted windows on the SUV violated state law.

After running the SUV's license plates, Det. Shipp discovered that the license plates were registered to a Toyota automobile. Det. Shipp followed the SUV off I-70 and onto an exit for Branch Street. As the car turned onto Branch Street, Det. Shipp activated his roof lights in order to conduct a traffic stop. The SUV accelerated at a high rate of speed and fled westbound on Branch Street. Det. Shipp did not pursue the SUV as department policy prohibited chases for traffic violations.

Det. Shipp stopped his car, deactivated his roof lights, and transmitted an all-points bulletin describing the SUV, Hearing the all-points bulletin, Det. Thomas Mayer ("Det. Mayer"), a detective for the St. Louis Police Department, pulled his vehicle alongside Det. Shipp's car. The two officers began conversing about the attempted traffic stop. After a short while, the SUV reappeared and began driving the wrong way—eastbound—down Branch Street directly towards the officers.

Before reaching the officers' location, the SUV turned south onto 20th Street and stopped. The officers immediately followed the SUV and pulled their vehicles within a short distance behind the SUV. The officers exited their respective vehicles. Det. Mayer approached the driver's side of the SUV, while Det. Shipp approached the passenger's side. At trial, Det. Mayer identified Shelton as the driver and sole occupant of the SUV. Det. Mayer observed Shelton emerge from the SUV, drop a plastic bag from his right hand to the "threshold" of the vehicle, and then flee on foot. Det. Mayer recalled that Shelton, from about a car length away, turned and looked over his shoulder at the detective for a couple seconds. Det. Mayer's view of Shelton was unobstructed. Det. Mayer said he could "clearly see" Shelton's face. From the passenger's side of the SUV, Det. Shipp could not identify the driver of the SUV, but recalled that the man wore blue jeans and a blue shirt. Shelton eluded capture and was not apprehended at the time.

After Shelton fled, Det. Mayer secured the dropped plastic bag. The plastic bag contained about 116 grams of heroin. The officers found items in the SUV pertaining to Shelton and Jerome Carter-Moore ("Carter-Moore"). Det. Mayer viewed pictures of both men in a police database, and identified Shelton as the driver of the SUV. Carter-Moore was the owner of the SUV.

The police impounded and searched the SUV. Evidence technicians found the following evidence linking Shelton to the vehicle: (1) a suitcase with a luggage tag containing Shelton's name; (2) a check made payable to Shelton; (3) mail addressed to Shelton; (4) a banking receipt containing Shelton's information; (5) fingerprints and DNA matched to Shelton that were extracted from the SUV; and (6) a business card for Shelton's probation officer.

Officers contacted Shelton's probation officer, who confirmed that Shelton had checked into her office earlier that morning. Video surveillance of the probation office showed that Shelton was wearing a

2. On September 5, 2013, Det. Shipp was an officer assigned to traffic safety.

blue or gray shirt with a collar. Police officers later located and arrested Shelton.

## III. The Defense's Evidence

Carter-Moore and Shelton were roommates. Carter-Moore testified that he owned Grips New Generation, a window-tinting and detail shop. On the morning of September 5, 2013, sometime between 10:30 a.m. and 11:30 a.m., Carter-Moore drove the SUV to work and parked behind his business. Carter-Moore explained that he left the keys in his SUV, and that he frequently did so because his employees often moved the SUV around the business without his permission. Carter-Moore also stated that Shelton frequently used the SUV and left personal items inside it.

Carter-Moore testified that, about an hour into his workday, he noticed his SUV was missing. Carter-Moore initially believed that an employee or family member had moved the SUV, but after an hour had passed, he began calling his employees and family members to ask about the SUV. Learning that none of his employees or family members knew the SUV's location, Carter-Moore reported to the police that his SUV was stolen. Carter-Moore stated that the police never returned his call, that "no one ever showed up," that he was calling the police regularly, and that he only discovered the impoundment of his SUV through his own efforts to locate the vehicle.

Shannon Spencer ("Spencer"), Carter-Moore's girlfriend and another roommate of Shelton, remembered that around 1:00 p.m. on September 5, 2013, she received a phone call from Carter-Moore. During the call, Carter-Moore asked Spencer if Shelton was home or if he had the SUV. Spencer testified that she entered Shelton's room and saw that he was sleeping.

## IV. The State's Rebuttal Evidence

The State called Police Officer Shawnita Barbee ("Officer Barbee") in rebuttal. Officer Barbee, a telephone-reporting officer, had received Carter-Moore's call about the missing SUV. Officer Barbee remembered that Carter-Moore told her that he was waiting to see if anyone had merely borrowed the vehicle and to see "if anyone's come back with it if they borrowed it." Officer Barbee advised Carter-Moore to call the non-emergency police line with an update if someone returned the SUV or to report that the SUV was actually stolen. According to Officer Barbee, Carter-Moore never called back or made any additional reports on the SUV.

## V. Closing Arguments

The State's initial closing argument did not address the credibility of the defense witnesses. During the defense's closing argument, defense counsel claimed that the State would probably argue "that somehow this car stolen thing wasn't a real thing. That this was some sort of cover. That Justin Shelton somehow called Jerome Carter-Moore, and he reported his car stolen so that they could get away with this particular crime. Brilliant, right." Defense counsel advised the jury that it would have to "discount down to zero" the defense witnesses' testimony in order to return a verdict of guilty.

In her rebuttal closing argument, the prosecuting attorney responded:

You can discount the defense witnesses' testimony down to zero. You can do that, and I'll tell you why. We know that Jerome Carter-Moore lied to us today. We know that. He was hem-hawing about how the police never called him. He never talked to anybody about that stolen car. He had to find out himself a week later that his car was towed. Well, we heard from Officer Barbee. She

talked to him. She took the report about his stolen car. She got the information from him about how his car was stolen. So we know that Jerome Carter-Moore lied to you on the stand today when he said I never heard from the police—

At that point, defense counsel objected, asserting that the State was arguing facts not in evidence. The trial court overruled the objection. The prosecuting attorney then continued: "I had to find out myself. I had to call the detective. No. Ms. Barbee took his report, like she's supposed to do. Took his report, found out how his car was stolen.... So you can discount Jerome Carter-Moore's testimony down to zero because he lied to you and he lied to the police about his car being stolen."

## VI. The Verdict and Shelton's Post-Trial Motions

The jury returned its verdict on February 3, 2016, finding Shelton guilty on one count of the Class A felony of second-degree drug trafficking. Shelton asked for, and received, a ten-day extension to file his motion for new trial. The motion for new trial was due on Monday, February 29, 2016.[3] Shelton filed an initial motion for new trial on February 29, 2016, in which he requested a new trial because the trial court failed to declare a mistrial after Prost's improper comment during voir dire.

On April 18, 2016, nearly seventy-five days after the jury returned its verdict, Shelton filed an amended motion for new trial based on newly discovered evidence. The amended motion for new trial alleged that Shamarcus McCullough ("McCullough") stole Carter-Moore's SUV on the morning of September 5, 2013. Affidavits from McCullough and Shelton's legal in-

vestigator were attached to the motion. Neither Shelton's initial or amended motion requested a new trial based on the State's closing argument.

In a subsequent hearing, McCullough testified that, when he was a minor, he stole Carter-Moore's SUV from the area outside the detail shop. McCullough averred that neither Shelton nor defense counsel knew of his role in the theft before trial, but that a card was left on his door instructing him to call Shelton's legal investigator a few months after trial. McCullough explained that he was familiar with the area as his aunt lived near the detail shop. Claiming that he wore plastic gloves, McCullough allegedly waited several minutes to see if the SUV was unattended before stealing the vehicle. McCullough then drove the SUV downtown towards the projects. Once there, McCullough purportedly sold the vehicle to a local drug dealer for $750 in cash. McCullough claimed that the drug dealer dropped him off at the intersection of Park and Jefferson Avenues around 12:30 p.m. The State, to counter McCullough's testimony and affidavit, introduced McCullough's school records showing that he had attended school that day.

The trial court denied Shelton's request for a new trial. The trial court, finding Shelton a persistent offender and a persistent drug offender, sentenced him to 12 years in prison. This appeal follows.

## Points on Appeal

Shelton raises three points. First, Shelton asserts that the trial court erred in denying his request for a mistrial after a veniremember purportedly opined on the credibility of the State's witnesses. Next,

---

**3.** The motion for new trial was initially due on Sunday, February 28, 2016. However, because the due date fell on a Sunday, Shelton could timely file his motion for new trial on the following Monday. See Rule 44.01(a).

Shelton claims plain error by the trial court when it permitted the prosecuting attorney to mischaracterize the testimony of a defense witness during closing argument. Finally, Shelton avers that he is entitled to a new trial because there was newly discovered evidence establishing his innocence.

## Discussion

### I. Point One—Motion for Mistrial During Voir Dire

#### A. Standard of Review

 This court will review the trial court's refusal to grant a mistrial for abuse of discretion. State v. Williams, 411 S.W.3d 315, 318 (Mo. App. E.D. 2013). The ruling on a request for a mistrial "is left to the sound discretion of the trial court because it is in the best position to observe the impact of the problematic incident[.]" State v. Ballinger, 298 S.W.3d 572, 574 (Mo. App. S.D. 2009). A trial court abuses its discretion when its ruling is "clearly against the logic of the circumstances then before it and when the ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." State v. Roberson, 501 S.W.3d 465, 470 (Mo. App. W.D. 2016) (quoting State v. McClendon, 477 S.W.3d 206, 215 (Mo. App. W.D. 2015)).

#### B. No Abuse of Discretion

Shelton asserts that the trial court should have declared a mistrial after Prost purportedly opined on the credibility of some of the police officers testifying for the State. Specifically, Shelton targets Prost's statement that "[t]aking the personal relationship out of it and make it strictly professional, all three of those detectives having worked for me, I trust their—." Shelton suggests that Prost's commentary improperly vouched for the credibility of the testifying officers and

unduly influenced the jury's evaluation of the evidence.

 "The purpose of voir dire is to discover bias or prejudice in order to select a fair and impartial jury." State v. Reyes, 108 S.W.3d 161, 165 (Mo. App. W.D. 2003) (quoting State v. Clark, 981 S.W.2d 143, 146 (Mo. banc 1998)). An adequate voir dire, therefore, identifies unqualified jurors and ensures the impartiality of the jury selected. State v. Johnson, 207 S.W.3d 24, 40 (Mo. banc 2006). "Both the defendant and the [S]tate are entitled to selection of a fair and impartial jury." State v. Lacy, 851 S.W.2d 623, 629 (Mo. App. E.D. 1993). To this end, the State may ask questions, to the extent permitted by the trial court, to reveal biases by inquiring into the potential jurors' relationship with possible witnesses. State v. Moiser, 738 S.W.2d 549, 565 (Mo. App. E.D. 1987). In so doing, the questions posited might actually elicit responses from veniremembers that identify disqualifying biases. See State v. Bushman, 642 S.W.2d 117, 120 (Mo. App. W.D. 1982) (noting that in searching "to discover during voir dire the hidden predilections of individual veniremen, it is inevitable that responses evincing bias will be extracted from time to time.").

 However, the disqualification of an individual juror for bias or expression of an opinion is usually insufficient for challenging the entire venire. State v. Stewart, 296 S.W.3d 5, 10 (Mo. App. S.D. 2009). To require the declaration of a mistrial, the defendant must show that the veniremember's "comments were so prejudicial and inflammatory" so as to limit the defendant's right to a fair trial. Id. at 11. The burden is on the defendant to demonstrate that the impartiality of the venire was tainted by the prejudicial comments made during voir dire. State v. Taylor, 166

S.W.3d 599, 608 (Mo. App. S.D. 2005). We recognize that the trial court "is in the best position to determine the impact of a juror's statement upon other members of the panel." Id. (quoting State v. Kelley, 83 S.W.3d 36, 41-42 (Mo. App. W.D. 2002)). Indeed, the trial court is better positioned to evaluate the events of voir dire than an appellate court, which must exclusively rely on a cold record. See State v. King, 964 S.W.2d 480, 486 (Mo. App. S.D. 1998). The trial court may consider the ambiguity, the tone, and the context of a remark made by a veniremember in determining whether or not the statement unduly influenced the entire venire. See Taylor, 166 S.W.3d at 609.

The trial court's declaration of a mistrial "is a drastic remedy and should be employed only in the most extraordinary circumstances." Williams, 411 S.W.3d at 318. Thus, when a veniremember's remark demonstrates bias against the defendant, the removal of that particular veniremember and an instruction from the judge to disregard the remark are ordinarily sufficient to remedy any prejudice experienced. Stewart, 296 S.W.3d at 10-11. The fact that a defendant declines a curative instruction and seeks no other relief than a mistrial cannot aid his or her cause. State v. Weekley, 92 S.W.3d 327, 330 (Mo. App. S.D. 2002).

Considering voir dire as a whole, we do not find Prost's comment so inflammatory as to poison the entire venire and require a mistrial. The exchange identified by Shelton occurred early in voir dire. During the initial introductory questioning, Prost acknowledged that he knew the witnesses listed by the State and that he had supervised certain testifying officers in some capacity. Further, Prost opined that based on his professional relationship with the testifying officers, he "trusted their— [.]"

Both the trial court and defense counsel acted quickly to limit Prost's comment. Due to this quick action, Prost's interrupted comment regarding the State's witnesses remained vague and imprecise. While a reasonable inference can be drawn that Prost trusted some aspect of the testifying witnesses' professional abilities, the exact nature of his comment remained unclear. The unspecific and incomplete nature of Prost's comment diminished the force, persuasiveness, and influence of his opinion to the rest of the venire. Accordingly, the vague and unfinished nature of Prost's statement lessened the need for a mistrial. See Taylor, 166 S.W.3d at 608-09 (finding that a trial court could consider the ambiguity and passivity of a veniremember's comment in determining if the comment spoiled the entire venire). Further, there is nothing in the record to suggest that Prost's one incomplete comment received undue attention by the parties, the venire, or otherwise earned any degree of attention during the proceedings. We note that the record shows that both parties extensively questioned the venire regarding the trustworthiness of police witnesses; and fully explored the venire's impartiality towards the testimony of police officers.

We also find informative State v. Evans, 701 S.W.2d 569 (Mo. App. E.D. 1985). In Evans, a veniremember was closely acquainted with a witness for the state. Id. at 574. The veniremember informed the venire that the State's witness was a longtime family friend, was employed by the same company, and belonged to the same church as the veniremember's family. Id. The veniremember indicated that she would believe the testimony of the witness in question. Id. The trial court struck the veniremember for cause, but rejected the defendant's request for a mistrial. Id. at 574-75. On appeal, we held that the trial

court did not abuse its discretion. Id. at 575. We stressed that the veniremember's statement that she would believe the testimony of the State's witness—which was based upon the veniremember's past experiences with the witness—"was not so inflammatory and prejudicial that the entire jury was infected." Id.

Here, one veniremember began to comment on the credibility of certain witnesses for the State based upon a prior working relationship. Like the veniremember in Evans, Prost intimated that, after briefly explaining his past relationship with the witnesses, he might in some fashion trust the testimony of the State's witnesses. Prost's comment justified his exclusion from serving on the jury for cause. However, Prost's limited utterance did not introduce a level of prejudice that adversely influenced other members of the venire in such a manner that mandated the declaration of a mistrial.

A careful review of the record reveals that the trial court understood, considered, and addressed the issue identified by Shelton. The trial court, after counsel approached the bench, succinctly explained the problematic nature of the question posited by the State and instructed the State to move on from examining Prost. Indicating that it would strongly consider issuing a curative instruction if requested by the defense, the trial court proposed an alternative remedy that would resolve Shelton's concerns. Shelton chose not to request a limiting instruction. Upon our review of the entire record, the trial court's ruling does not shock our sense of justice or indicate a lack of careful consideration. Accordingly, the trial court did not abuse its discretion. Point One is denied.

## II. Point Two—Improper Closing Argument

### A. Standard of Review

Shelton concedes that he did not include his claim of improper closing argument in his motion for new trial. To preserve an allegation of error in a jury-tried criminal case that does not challenge the jurisdiction of the court, the sufficiency of the charge, or the sufficiency of the evidence, the defendant must include his or her claim of error in a motion for new trial. State v. Hannon, 398 S.W.3d 108, 115 (Mo. App. E.D. 2013); Rule 29.11(d).[4] Because Shelton did not include this claim in a timely motion for new trial, he did not properly preserve this point for appeal. Shelton requests plain-error review of his point under Rule 30.20.

Rule 30.20 allows claims that are not preserved to be reviewed for plain error in the discretion of the court. State v. Taylor, 466 S.W.3d 521, 533 (Mo. banc 2015). Plain-error review involves a two-step process. Hannon, 398 S.W.3d at 116. First, the reviewing court must determine whether the alleged error "facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice occurred." State v. Johnson, 477 S.W.3d 218, 224 (Mo. App. W.D. 2015) (quoting Taylor, 466 S.W.3d at 533). Plain errors are those which are "evident, obvious, and clear." State v. Hunt, 451 S.W.3d 251, 260 (Mo. banc 2014). If the court finds plain error, it "must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice." Hannon, 398 S.W.3d at 116 (quoting State v. Baumruk, 280 S.W.3d 600, 607-08 (Mo. banc 2009)).

"[P]lain-error relief as to closing argument should rarely be granted[.]" State v. McClendon, 477 S.W.3d 206, 217 (Mo. App. W.D. 2015) (quoting State v.

4. All rule references are to Mo. R. Crim. P. (2016).

Crowe, 128 S.W.3d 596, 600 (Mo. App. W.D. 2004)). The trial court is vested with considerable discretion regarding closing arguments. State v. Johnson, 284 S.W.3d 561, 573 (Mo. banc 2009). Rather than viewing a selected segment of argument in isolation, we consider the entire record when interpreting a party's closing argument. Id. Even if closing argument is ruled improper, "we will reverse a conviction only if the defendant establishes that the comment had a decisive effect on the jury's determination." McClendon, 477 S.W.3d at 217 (quoting Crowe, 128 S.W.3d at 600).

B. No Error, Plain or Otherwise

Shelton contends that the trial court plainly erred in permitting the prosecuting attorney to argue that Carter-Moore was lying and that the jury should discount Carter-Moore's testimony to zero. Shelton argues that there was no evidence in the record allowing the State to draw this inference, and thus the State's prejudicial argument was unsupported by the evidence.

■ In its closing argument, the State may make and assert reasonable inferences drawn from the evidence. State v. Vanlue, 216 S.W.3d 729, 734 (Mo. App. S.D. 2007). Further, courts grant the State, as well as the defense, "wide latitude in drawing inferences from the record when presenting its closing argument." State v. Forrest, 183 S.W.3d 218, 228 (Mo. banc 2006). This wide latitude includes allowing the State to argue the credibility, or lack thereof, of witnesses as long as these arguments are based on the evidence. State v. Calhoun, 259 S.W.3d 53, 59 (Mo. App. W.D. 2008). Indeed, the State may comment on the truth or falsity of the testimony given by a defense witness, "even to the point of belittling and/or discussing the improbability of specific testimony." Vanlue, 216 S.W.3d at 734 (quoting State v. Clayton, 995 S.W.2d 468, 480 (Mo.

banc 1999)); State v. Taylor, 831 S.W.2d 266, 269-70 (Mo. App. E.D. 1992).

■ Further, when the defendant challenges remarks made by the State during its rebuttal closing argument, the trial court, in evaluating the propriety of the comments, may consider whether the State's argument was invited by the defense. State v. Williams, 405 S.W.3d 592, 601 (Mo. App. S.D. 2013). "The State may go further by way of retaliation in answering the argument of the defendant than would be normally allowed." Id. (quoting State v. Pratt, 858 S.W.2d 291, 292 (Mo. App. E.D. 1993)). The State may retaliate to an issue raised by the defense even if the State's argument would be improper under normal circumstances. State v. Sanchez, 186 S.W.3d 260, 265 (Mo. banc 2006).

■ Here, we hold that the trial court did not err, plain or otherwise, when it allowed the State to argue that the jury should "discount to zero" the testimony of defense witness, Carter-Moore. We note that Shelton first commented in his closing argument that, to convict Shelton, the jury would have to discount Carter-Moore's testimony to zero. The State responded to Shelton's argument and offered the jury reasons why it should indeed discount Carter-Moore's testimony to zero. Specifically, the State argued that: "We know that Jerome Carter-Moore lied to us today.... He was hem-hawing about how the police never called him. He never talked to anybody about that stolen car. He had to find out himself a week later that his car was towed. Well, we heard from Officer Barbee. She talked to him. She took the report about his stolen car. She got the information from him about how his car was stolen. So we know that Jerome Carter-Moore lied to you on the stand today when he said I never heard from the police—[.]"

From the outset we note certain inconsistencies between the testimony of Carter-Moore and the State's rebuttal witness, Officer Barbee. Carter-Moore testified that he timely reported his vehicle stolen, and then accused the police of not returning his call and never showing up at the scene to investigate. Carter-Moore stressed that he called the police regularly in an attempt to locate his SUV, and maintained that he found his SUV only through his own efforts. By contrast, Officer Barbee told the jury that Carter-Moore called the police and said that he was unsure if his SUV actually was stolen or temporarily borrowed, and that he was going to wait to see if anybody returned it. Officer Barbee advised Carter-Moore to call the police with an update, but Carter-Moore never did. Officer Barbee testified that Carter-Moore made no further reports to the police about his SUV.

The record reasonably allows the State to suggest that Carter-Moore's testimony at trial was not truthful. Officer Barbee recorded the information that the SUV may have been stolen. Officer Barbee directed Carter-Moore to call the police back when he had more information about his SUV. This testimony directly contradicted Carter-Moore's testimony. Thus, the State, in its rebuttal argument, was entitled to argue that Carter-Moore's testimony was not truthful and that the jury should discount it. Shelton introduced the idea that the only way the jury could convict him was by discounting the testimony of his witnesses to zero. He cannot now complain that the State responded to his challenge.

Given the wide latitude and discretion we provide the trial court in controlling closing arguments, we do not find that the trial court committed any error, plain or otherwise, in allowing the State's comments during closing argument. Point Two is denied.

## III. Point Three—Motion for New Trial Based on Newly Discovered Evidence

### A. Timeliness of the New Trial Motions

The State asserts that we should not consider the merits of Point Three because Shelton's amended motion for new trial was untimely. Rule 29.11(b) provides that, in a criminal case, a motion for new trial must be filed not later than fifteen days after the verdict is returned, and for good cause shown, the court may extend the time for filing by one additional period not to exceed ten days. State v. Wright, 391 S.W.3d 893, 895 (Mo. App. E.D. 2013). Rule 29.11(b) applies to requests for new trials based upon newly discovered evidence. State v. Young, 943 S.W.2d 794, 799 (Mo. App. W.D. 1997). The time limitations in Rule 29.11(b) for filing a motion for new trial in criminal cases are mandatory. State v. Langston, 229 S.W.3d 289, 294 (Mo. App. S.D. 2007).

Rule 29.11(b) "does not make an exception extending the time to file a motion, even where the newly discovered evidence on which the motion for a new trial is predicated is not discovered until after the filing deadline has passed." State v. Stephens, 88 S.W.3d 876, 880 (Mo. App. W.D. 2002). Because no exception is provided, a "'request to add a ground to the motion for new trial is a nullity' when it is made after the extension period has expired." State v. Shinn, 420 S.W.3d 619, 628 (Mo. App. S.D. 2013) (quoting State v. Bartlik, 363 S.W.3d 388, 391 (Mo. App. E.D. 2012)). In other words, a motion for new trial may not be filed or amended to allege, "as a basis for a new trial, the existence of newly discovered evidence which was not discoverable until after the filing deadline had passed." Stephens, 88 S.W.3d at 880. Accordingly, an untimely

motion for new trial is *not* an appropriate means to introduce new evidence, preserves nothing for appeal, and is a procedural nullity. State v. Williams, 504 S.W.3d 194, 197 (Mo. App. W.D. 2016). Nevertheless, an appellate court may review the untimely claim to determine whether "extraordinary circumstances" exist that justify remand and establish that manifest injustice or miscarriage of justice occurred. See Williams, 504 S.W.3d at 197.

■ The jury returned its verdict on February 3, 2016. The initial deadline for Shelton's post-trial motion was February 18, 2016. See Rule 29.11(b). Shelton received a ten-day extension until Sunday, February, 28, 2016 to file his motion for new trial. Because the filing period ended on a Sunday and the subsequent Monday was not a legal holiday, the motion became due on Monday, Feburary, 29, 2016. See Rule 44.01(a). Shelton timely filed his initial motion for new trial on February 29, 2016. That motion did not request a new trial based on newly discovered evidence. On April 18, 2016, well after the mandatory February deadline had passed, Shelton filed an amended motion, then claiming the discovery of new evidence proving his innocence.

Even though the new evidence was purportedly discovered after the late-February deadline, Shelton's claim for a new trial based on newly discovered evidence remains untimely. Shelton's initial motion for new trial may not be amended to include his new claim once the filing deadline has passed. See Williams, 504 S.W.3d at 197; Shinn, 420 S.W.3d at 628; Stephens, 88 S.W.3d at 880. Because the amended motion for a new trial was untimely, it preserves nothing for appellate review and is a procedural nullity. State v. Garner, 976 S.W.2d 57, 60 (Mo. App. W.D. 1998).

B. No Extraordinary Circumstances

■ Recognizing the procedural barrier to our review of his amended motion for new trial, Shelton invites this Court to find plain error or to grant a new trial based on our inherent power to prevent manifest injustice or miscarriage of justice in extraordinary circumstances. We decline this invitation because no extraordinary circumstances are presented in the record to justify a remand for a new trial or warrant any other relief. Here, the trial court heard and received evidence surrounding Shelton's claim of new evidence, before rejecting it. Assuming that Shelton had included this claim in his timely filed motion for new trial, the trial court would not have abused its discretion in denying his claim on the merits.

Shelton points to McCullough's post-trial affidavits and testimony admitting that McCullough stole Carter-Moore's SUV on the morning of September 5, 2013, before selling the vehicle to a local drug dealer. Shelton argues that this newly discovered evidence conclusively demonstrates that he was not the driver of the SUV and refutes Det. Mayer's identification to the contrary.

■ Rule 29.11(a) provides that the trial court "may grant a new trial upon good cause shown." Williams, 504 S.W.3d at 197 (quoting Rule 29.11(a)). While a trial court may grant a new trial for good cause, "new trials based on newly discovered evidence are disfavored." Id. (quoting State v. Stewart, 313 S.W.3d 661, 665 (Mo. banc 2010)). To show good cause in the case of newly discovered evidence, the movant must meet the following requirements: "(1) The facts constituting the newly discovered evidence have come to the movant's knowledge after the end of the trial; (2) Movant's lack of prior knowledge is not owing to any want of due diligence on his part; (3) The evidence is so material that it is likely to produce a different result at a new trial; and (4) The evidence

is neither cumulative only nor merely of an impeaching nature." [5] Shinn, 420 S.W.3d at 628 (quoting State v. Terry, 304 S.W.3d 105, 109 (Mo. banc 2010)).

Shelton does not demonstrate the necessary "good cause" to warrant relief. Shelton did not meet his burden on the second and third requirements listed above. Regarding the second requirement, Shelton did not sufficiently demonstrate that his "lack of prior knowledge [was] not owing to any want of due diligence on his part." Before the trial court, Shelton claimed in a conclusory fashion that he did not, and could not, have known about McCullough's role in purportedly stealing the vehicle. Shelton hired a legal investigator *after* his trial. At the evidentiary hearing, McCullough testified that a card from Shelton's legal investigator was left at his door a few months after trial, instructing him to call the legal investigator. Shelton provided no explanation whatsoever as to how he discovered the evidence contained in McCullough's affidavit and testimony, what led his investigator to McCullough, or what steps, if any, he took to discover the new evidence before trial. Without additional explanation or evidence provided, we are unable to determine from the record if Shelton, exercising due diligence, reasonably could have discovered this exculpatory information from McCullough before trial. Shelton's failure to sufficiently demonstrate this prong precludes relief on the grounds that evidence was newly discovered post-trial. See State v. Ryan, 229 S.W.3d 281, 288 (Mo. App. S.D. 2007).

Pertaining to the third requirement for showing good cause, newly discovered evidence is deemed "so material that it is likely to produce a different result at a new trial" if the evidence is "(1) credible; and (2) 'reasonably sufficient to raise a substantial doubt in the mind of a reasonable person as to the result of a new trial.'" State v. Manley, 414 S.W.3d 561, 566 (Mo. App. E.D. 2013) (quoting State v. Hannon, 398 S.W.3d 108, 114 (Mo. App. E.D. 2013)). We reject McCullough's proffered affidavit and testimony as being credible and reasonably sufficient to raise a substantial doubt in the mind of a reasonable person. First, the record contains no corroborating evidence supporting McCullough's statement that he stole the SUV and sold it to an unidentified drug dealer years earlier when he was a minor. Cf. Stewart, 313 S.W.3d at 666 (determining that self-incriminatory statements made shortly after an alleged crime, "that also are corroborated by confirmed DNA evidence, carry substantial indicia of reliability that lends to their trustworthiness."). There was no identifying information or physical evidence tying McCullough to the SUV, Nothing, besides McCullough's own statement years later, linked him to the SUV.

Next, McCullough's testimony that he stole the SUV was directly contradicted by Det. Mayer's testimony and McCullough's school records. Det. Mayer testified at trial that he saw Shelton, not McCullough or an unknown drug dealer, flee from the SUV. Det. Mayer could "clearly see" the face of the escaping driver. Det. Mayer was confident in his identification and nothing obstructed his view. Further, school records showed that McCullough was at school at the time he supposedly stole the SUV. Det. Mayer's conflicting testimony and McCullough's school records significantly undermine the credibility of the new evidence advanced by Shelton.

5. Regarding the fourth requirement, however, there "maybe an exceptional circumstance 'where impeachment is reason to remand to the trial court to grant a new trial at the appellate court's discretion.'" State v. Nylon, 311 S.W.3d 869, 876 (Mo. App. E.D. 2010) (quoting State v. Terry, 304 S.W.3d 105, 110 (Mo. banc 2010)).

The trial court received and heard Shelton's newly discovered evidence before denying him relief. Even were we to treat Shelton's claim based upon newly discovered evidence as timely filed, the trial court nevertheless would not have abused its discretion in denying Shelton's motion. The credibility of McCullough's testimony on the motion for new trial was for the trial court to determine. If the trial court was not satisfied with McCullough's testimony, it was the trial court's duty to deny a new trial. See Garner, 976 S.W.2d at 60. Shelton's untimely motion does not present us with "extraordinary circumstances" justifying remand for a new trial under our inherent power to prevent manifest injustice or miscarriage of justice. Point Three is denied.

## Conclusion

The judgment of the trial court is affirmed.

James M. Dowd, P.J., concurs.

Gary M. Gaertner, Jr., J., concurs.